**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| PAUL MONTADOR, Executor and Estate Trustee of the Estate of STEVEN R. MONTADOR, Deceased, | |
| Plaintiff, | ECF Document |
| | Civil Action No. |
| v. | Plaintiff Demands Trial by Jury |
| NATIONAL HOCKEY LEAGUE and NATIONAL HOCKEY LEAGUE BOARD OF GOVERNORS, | |
| Defendants. | |

**<u>COMPLAINT AT LAW</u>**

Plaintiff, PAUL MONTADOR, Executor and Estate Trustee of the Estate of STEVEN R.

MONTADOR, Deceased, by and through his attorneys, CORBOY & DEMETRIO, P.C.,

complaining of Defendants, NATIONAL HOCKEY LEAGUE ("NHL") and NATIONAL

HOCKEY LEAGUE BOARD OF GOVERNORS, states:

1.     At age twenty (20), STEVEN R. MONTADOR signed with the Calgary Flames

NHL team, and began his professional hockey career.

2.     From 2001 through 2013, STEVEN R. MONTADOR participated in five-

hundred-seventy-one (571) NHL regular season hockey games and forty-three (43) NHL playoff

games for the Calgary Flames, the Florida Panthers, the Anaheim Ducks, the Boston Bruins, the

Buffalo Sabres and the Chicago Blackhawks.

3.      During NHL games, STEVEN R. MONTADOR participated in sixty-nine (69) on-ice fist fights.[1]

4.      During regular season NHL games, pre-season NHL games, NHL practices and morning skates prior to NHL games, STEVEN R. MONTADOR sustained thousands of sub-concussive brain traumas and multiple concussions,[2] many of which were undiagnosed and/or undocumented.

5.      STEVEN R. MONTADOR'S documented concussions were multitudinous and frequent.  For example, in 2003, STEVEN R. MONTADOR sustained at least three (3) concussive brain traumas in six (6) months; in 2010, he sustained at least four (4) concussive brain traumas in nine (9) months; and, in 2012, while with the Chicago Blackhawks, STEVEN R. MONTADOR suffered at least four (4) concussive brain traumas in a three (3) month period.[3]

6.      In 2013, STEVEN R. MONTADOR retired from the NHL.

---

[1] http://www.hockeyfights.com/players/496 details each of STEVEN R. MONTADOR's NHL fights.

[2] Concussion is defined as "a traumatically induced alteration in brain function manifested by an alteration of awareness or consciousness."  Pellman, E, Viano, D, Tucker, A, et.al., *Concussion in Professional Football: Reconstruction of Game Impacts and Injuries,* Neurosurgery, Vol. 53(4) (2003).

[3] On January 8, 2012, STEVEN R. MONTADOR suffered an obvious concussion when punched in the face by Johan Franzen in overtime of the Red Wings - Blackhawks game. STEVEN R. MONTADOR's consciousness was briefly altered and he felt hazy.  He was diagnosed with a concussion.
  On January 10, 2012, STEVEN R. MONTADOR was cleared to perform his duties as an NHL hockey player, including playing in NHL games.
  On January 10, 2012, STEVEN R. MONTADOR was involved in an on-ice fight with Jared Boll during which he was punched in the head over ten (10) times.
  On January 12, 2012, STEVEN R. MONTADOR played in a game against the Minnesota Wild and was hit in the head on numerous occasions.
  On January 13, 2012, STEVEN R. MONTADOR was diagnosed with a concussion.
  On January 14, 2012; January 15, 2012; January 18, 2012; January 21, 2012; January 24, 2012; January 31, 2012; February 2, 2012; and February 3, 2012, STEVEN R. MONTADOR played in NHL games, sustaining numerous blows to the head and engaging in one on-ice fight.
  On February 7, 2012, during a game against the Avalanche, STEVEN R. MONTADOR again suffered a diagnosed concussion.
  On March 24, 2012, STEVEN R. MONTADOR was cleared to perform his duties as an NHL hockey player, including playing in NHL games.
  On March 27, 2012, during a game against the New Jersey Devils, STEVEN R. MONTADOR again suffered a diagnosed concussion.

7.     As a result of the repetitive brain traumas sustained during his NHL career, STEVEN R. MONTADOR experienced significant memory issues, sleep disturbances, chronic pain, a substance abuse problem, photosensitivity, mood and behavioral changes, decreased appetite, anxiety, and depression both during, and after, his NHL career.

8.     On February 15, 2015, STEVEN R. MONTADOR, age thirty-five (35), died.

9.     Post-mortem, Neuro-pathological review of STEVEN R. MONTADOR's brain at Krembil Neuroscience Centre's Canadian Sports Concussion Project determined that STEVEN R. MONTADOR was suffering from progressive, advanced brain damage, commonly referred to as Chronic Traumatic Encephalopathy ("CTE").[4]

10.     CTE caused progressive deterioration in STEVEN R. MONTADOR's brain, specifically, in the areas of his brain that control judgment, inhibition and impulse control, mood, behavior and memory, resulting in STEVEN R. MONTADOR experiencing headaches, poor memory, a lack of impulse control, mood and behavioral disturbances, and executive dysfunction.

11.     CTE caused, or contributed to cause, STEVEN R. MONTADOR's death.

**THE PARTIES**

12.     On May 26, 2015, PAUL MONTADOR was appointed by the Ontario Superior Court of Justice at Brampton as Estate Trustee for the Estate of STEVEN R. MONTADOR and

---

[4] CTE is found exclusively in the brains of humans that have been subjected to repetitive head trauma. CTE has been discovered in the brains of former NHL players, Reggie Fleming, Bob Probert, Rick Martin and Derek Boogaard (Todd Ewen's brain is currently being examined). Remarkably, the NHL's Commissioner, Gary Bettman, publicly states that "from a medical and science standpoint, there is no evidence yet that [repetitive head trauma in NHL hockey] necessarily leads to [CTE]."

named Executor of STEVEN R. MONTADOR's Estate. In that representative capacity, PAUL

MONTADOR brings this action on behalf of STEVEN R. MONTADOR's surviving family

members: Morrison Montador Robidoux, son; Paul Montador, father; Donna Montador, mother;

Lindsay Montador, sister; and Chris Montador, brother, each of whom have and/or will

experience grief and sorrow as well as a significant loss of love, affection, guidance, comfort,

counsel and support as a result of STEVEN R. MONTADOR's death.

13.     At the time of his death, STEVEN R. MONTADOR was a Canadian resident.

14.     The NHL operates a professional ice hockey league, consisting of thirty franchised

member clubs, from its league office in New York City, New York.

15.     The NHL operates a franchise, the Chicago Blackhawks, located at 1901 West

Madison Street, Chicago, Cook County, Illinois 60612, where STEVEN R. MONTADOR played

multiple games and engaged in on-ice fights during his NHL career.

16.     The NHL is governed by the NHL BOARD OF GOVERNORS which establishes

the policies of the League.

17.     The NHL and the NHL BOARD OF GOVERNORS have the ultimate authority to

establish and determine the playing rules and policies of NHL hockey and the environment in

which the game is played. As the stewards of the game of professional hockey in the United

States and Canada, these Defendants control how the game is played and, if, and when, players

are provided warnings of injury risk(s).

18.     The Defendants have the power to implement changes to the game to promote

player safety, including, but not limited to, controlling the playing environment (i.e., the ice

conditions, the boards and glass) and imposing Supplemental Discipline in reaction to certain

4

actions on the ice.

19.     In addition, the Defendants have studied certain player safety issues in furtherance of their stated commitment to keep NHL players safe during, and after, their NHL careers. These studies, throughout the years, have purported to inform interventional strategies intended to reduce the risks of injury in NHL hockey. These interventional strategies include certain warnings to players of certain injury risks (both patent and latent).

20.     At all relevant times, the Defendants owed a duty to STEVEN R. MONTADOR to keep him reasonably safe during his career and to provide him with the most up-to-date medical information on all issues, including the increased risk of long-term brain damage.

21.     The NHL has long known that its players were susceptible to developing CTE and other neurodegenerative brain diseases as a result of the fist-fighting it allowed and promoted, the hard hits it encouraged and marketed, and/or the blows to the head that it steadfastly refused to eliminate from its game.

22.     But, the NHL, armed with vastly superior managerial, medical, legal and other resources to gather, analyze, and understand sub-concussion, concussion and head injury data, with unilateral authority to regulate equipment, enact rule changes, mete out discipline, mandate injury protocols, and provide warnings to protect its players from the short and long term consequences of concussions, failed to keep STEVEN R. MONTADOR reasonably safe during his career and utterly failed to provide him with crucial medical information on the permanent ramifications of brain trauma.

## COUNT I

## THE NHL's FAILURE TO WARN STEVEN R. MONTADOR OF THE LONG-TERM NEUROLOGICAL RISKS ASSOCIATED WITH REPETITIVE HEAD TRAUMA SUBJECTED HIM TO SIGNIFICANT PAIN, SUFFERING AND MENTAL DISTRESS

Plaintiff re-alleges paragraphs 1 - 22 above and incorporate each allegation herein.

23.     One of the areas of player safety that the NHL gratuitously committed to studying was the issue of repetitive head trauma sustained by NHL players.

24.      Beginning in 1997, the NHL endeavored into the study of repetitive concussive and/or sub-concussive brain traumas amongst its player population.[5]

25.     In furtherance of its study, the League collected and analyzed data on every player, including, but not limited to, birth date, educational background, playing history, contract history, injury[6] and retirement data.  Additionally, it supposedly tracked all NHL concussions and stored video clips[7] of all NHL players who experienced concussions.

26.     The NHL, utilizing the data, supposedly studied the frequency, timing, duration of symptoms and mechanism of injury patterns for concussive brain traumas sustained by NHL players from 1997 through 2004.

27.     The NHL's study was highly anticipated by many, including NHL players.

28.     NHL players reasonably believed that the NHL's compiling of player medical

---

[5] The NHL consistently characterizes this 'concussion program' as a 'jointly administered' program with the NHLPA. This characterization is misleading– while certain aspects of the program may have enlisted a NLHPA representatives' involvement, the scope and focus of the program's activities were unilaterally dictated by the League. By way of example, the League determined which issues should be studied and which should be avoided.

[6] Originally using the NHL Injury Surveillance System (NHLISS), the NHL collects, processes, stores and analyzes injury and exposure data for the NHL teams.

[7] A study on the mechanisms of brain injury was performed by way of video analysis of every concussion suffered by an NHL player.

reports of brain traumas, memorializing video imagery of those NHL players sustaining

concussive brain trauma, and maintaining their neuropsychological testing results would provide

the NHL with sufficient data to thoroughly study the issues and provide them with the most

up-to-date information on the immediate and long-term risks of repetitive brain trauma in the

NHL.

29.     NHL players hoped that the NHL's study would address the critical question:

"Does repetitive head trauma in NHL hockey lead to long-term neurocognitive or

neurodegenerative changes in NHL players' brains?"

30.     During, and after, this study period, the NHL had, and confirmed, a duty to

analyze all issues related to repetitive brain trauma in the NHL and inform its players of the

findings – including, but not limited to, the long-term risk exposure its players faced.

31.     By gratuitously conducting scientific research and engaging in discussion of the

long-term effects of brain injuries sustained by NHL players, and by publicly maintaining that its

Concussion Program was thoroughly analyzing concussion data, the NHL gave its players the

false impression that it was working on their behalf to keep them informed and up-to-date on all

medical and scientific advancements related to repetitive head trauma.

32.      In reality, the NHL simply sat on the data it collected.  In fact, the NHL waited to

publish its data for fourteen years (i.e. 2011).[8]

33.     Avoiding any clear findings, the Concussion Program report, after fourteen years,

---

[8] That report, was, at best, watered down - discussing only the number of concussions in the NHL for the regular seasons from 1997-2004.  Listing nine specific study limitations, the report, fourteen years in the making, boiled down to a "more study is needed" dodge. The NHL's delay in publishing the Concussion Program report provided NHL players with a false sense of security that they were not at risk of permanent damage to their brains.

and despite an abundance of developing scientific and medical literature about head hits and concussions, found only "potential adverse effects" from "continuing to play while symptomatic, failing to report symptoms to medical staff and failure to recognize or evaluate any suspected concussion." The "potential adverse effects" were not explained in any way.

34. Soft-pedaling the problem still further, the report said only that its "findings also suggest that more conservative or precautionary measures should be taken in the immediate post-concussion period, particularly when an athlete reports or experiences a post-concussion headache, low energy or fatigue, amnesia, recurrent concussion or many different post-concussion symptoms, or when the athlete has an abnormal neurologic examination." In short, the report constituted another NHL assurance that brain damage was not a significant concern for NHL players.

35. The report did not conclude that players were at increased risk of developing a neurodegenerative disease or condition as a result of head hits while playing. Nor did the report put NHL players on notice that the forgetfulness, mood swings, difficulties concentrating, and other signs of what retired players chalked up to "aging," were in fact the result of the repetitive head trauma they suffered while playing.

36. All the report concluded, essentially, was that more education was needed about potential adverse effects.

37. In January 2010, neuropathologists from the Boston University School of Medicine Center for the Study of Traumatic Encephalopathy ("BUSM") and the Veterans Affairs Boston Healthcare System, in collaboration with the Sports Legacy Institute, confirmed for the first time that a former hockey player, New York Ranger Reggie Fleming, had been diagnosed

with CTE.

38.     In March 2011, Boston University's Center for the Study of Traumatic Encephalopathy announced that the brain of Bob Probert, age 45 at the time of his death, contained CTE as a result of contact to his head during his NHL career.  The NHL classified the findings as "interesting," but refused to "react or make changes based on findings related to one player."

39.     In the summer of 2011, three NHL Enforcers died, suddenly: Derek Boogaard, age 28; Rick Rypien, age 27; and Wade Belak, age 35.  After Boston University's Center for the Study of Traumatic Encephalopathy announced that it discovered CTE in Derek Boogaard's brain, the NHL publicly stated that "there isn't a lot of data, and the experts who we talked to . . . think that it's way premature to be drawing any conclusions at this point."

40.     Even to this day,[9] after repeatedly informing its players and the public that it is the "leader" in concussion care, knowledge, and research, the NHL boldly informs all NHL players, past, present and future, that there is no proven scientific or statistical evidence demonstrating a connection or correlation between repeated impacts to the head sustained in the NHL and long-term neurodegenerative diseases.

41.     The NHL's unwillingness to acknowledge the dangers of repetitive head trauma may be based on its historical refusal to study the long-term effects of repetitive head trauma on its players.  For example, in November 2009, the NHL contemplated studying the long-term neurocognitive and psychological effects of repeated concussions among retired NHL players.

---

[9] After STEVEN R. MONTADOR's death and subsequent discovery of CTE, challenging the link between concussions and CTE, Gary Bettman said, "from a medical and science standpoint, there is no evidence that one necessarily leads to the other."

But, the NHL decided it was uninterested in conducting such a study and would rather *"leave the dementia issues up to the NFL!"*  The Defendants wanted to avoid and ignore the inconvenient truth that such a study would confirm.

42.     As a result of its repeated decisions to bury its collective head in the sand, the NHL never conducted any proposed study on its retirees, apparently not wanting to confirm what it already suspected - that repetitive head trauma sustained in contact sports can, and does, lead to permanent brain damage.

43.     Not informing STEVEN R. MONTADOR that he risked serious and permanent and disabling brain injuries or cognitive problems if he suffered a concussion or continued to play after suffering a head hit, the League knew, or should have known, that STEVEN R. MONTADOR would understand the NHL's silence as affirmation that he not only could, but should, play in a violent manner and continue to play after a head injury, and that doing so posed no danger to his long term brain health.  The League induced him into continuing to play, and fight, in NHL games and practices.

44.     At the time of each of Montador's concussion injuries, the NHL knew, or should have known, about scientific evidence demonstrating a correlation between repetitive head trauma and chronic neuro-cognitive and neuro-degenerative illness and disabilities.  It had a duty to relay this information to its players.

45.     Defendants were under, but breached, a continuing duty to disclose the true character, quality, and nature of the after-effects of concussive events, sub-concussive events, and/or brain injuries.

46.     As part of this duty, the NHL was required to keep NHL players informed of

long-term neurological risks associated with head injuries suffered while playing hockey in the NHL, and not to omit material information about the risks of negative long-term effects or permanent neurological damage that can occur from head injuries incurred while playing hockey and/or fighting in hockey games.[10]

47.     In breach of its duty, the NHL never told STEVEN R. MONTADOR about the long-term dangers of repeated brain trauma.

48.     In breach of its duty, the League never told STEVEN R. MONTADOR or any NHL player that repetitive head trauma (like that sustained in bare-knuckle brawls) can, and does, cause brain damage, addiction and/or depression.

49.     In further breach of its duty, the NHL demonstrated an utter indifference and conscious disregard of NHL Players' long-term health by:

    (a)    creating, fostering, and promoting a culture of extreme violence, including head hits and violence from fighting, where head trauma to STEVE MONTADOR was a natural and common corollary;

    (b)    failing to inform STEVEN R. MONTADOR, or any NHL Players, about the century-old scientific research on the negative health effects of head trauma and about anecdotal evidence from the negative health effects of head trauma from its own NHL players;

    (c)    failing to warn STEVEN R. MONTADOR, or any NHL players, of the potential negative effects of head injuries suffered while playing in the NHL, including but not limited to, that they are at an increased risk for developing one or more serious, neurodegenerative diseases or conditions including, but not limited to, CTE, dementia, ALS, Alzheimer's disease, and Parkinson's disease, and the debilitating symptoms from each of them;

    (d)    failing to adequately address the continuing health risks associated with concussive events, subconcussive events and brain injuries that the NHL

---

[10] The NHL states that education has been a vital component of its mission since 1997, and that its "[e]ducational efforts are directed towards all relevant parties in our game, including most importantly our Players, but also relevant Club personnel, including Club medical staff, Club owners and executives, team General Managers and Coaches, and on-ice game Officials."

players sustained;

(e)    failing to make any statements of substance about concussions, MTBI or other head injuries;

(f)    turning a blind eye to the risks to players of repetitive subconcussive and concussive head impacts;

(g)    avoiding any proper study of concussions and other head injuries; and/or

(h)    failing to ensure that concussed players are adequately warned of the permanent dangers that could befall them if they continued to sustain further head injuries.

50.    As a result of the NHL's breaches of its duties, STEVEN R. MONTADOR, suffered injury, including, but not limited to, neurodegenerative disease, including CTE and its resulting symptoms.

51.    As a proximate result of one or more of the foregoing negligent acts or omissions, STEVEN R. MONTADOR suffered personal and pecuniary injuries, including conscious pain, suffering, and emotional distress prior to his death on February 15, 2015, and had he survived, he would have been entitled to bring an action for his injuries, and such action has survived him.

52.    Plaintiff, PAUL MONTADOR, Executor and Estate Trustee of the Estate of STEVEN R. MONTADOR, Deceased, brings this Survival Action, pursuant to 755 ILCS 5/27-6, commonly known as the Survival Act of the State of Illinois.

WHEREFORE, Plaintiff, PAUL MONTADOR, Executor and Estate Trustee of the Estate of STEVEN R. MONTADOR, Deceased, demands judgment against Defendants for a sum in excess of the minimum jurisdictional limit.

## COUNT II

## THE NHL'S INSISTENCE UPON PRESERVING and PROMOTING VIOLENCE IN SPITE OF THE OBVIOUS DANGERS CAUSED, or CONTRIBUTED TO CAUSE, STEVEN R. MONTADOR'S BRAIN DAMAGE, ADDICTION and DEPRESSION.

Plaintiffs re-allege paragraphs 1 - 22 above and incorporate each allegation herein.

53.    The NHL's avaricious desire to permit and promote fighting in the NHL game is reprehensible in light of its knowledge of the dangers of head trauma.

54.    Fighting is an easily identifiable and readily eliminated cause of concussive and sub-concussive brain traumas. Eliminating fighting necessarily reduces the incidence of trauma to the brain.  Reducing the incidence of concussions and MTBI necessarily reduces the risk of long term neurodegenerative diseases and conditions. But, fully aware of this common sense logic, and well aware that fighting results in brain injuries that lead to the tragedy of long term neurodegenerative diseases and their consequences, the NHL has steadfastly refused to eliminate fighting from its product due to concerns over the bottom line.

55.    The NHL's acceptance of fighting and, concomitantly, of the injuries and long term risks that fighting entails, demonstrates the fundamental fact that the NHL has always been, and remains, willing to sacrifice players' brains in the name of tradition and in the cause of profit.[11]

56.    Fighting causes a very dangerous combination of physical and emotional turmoil

---

[11] In December of 2011, Commissioner Bettman infamously stated, in an article titled, *Cox: Boogaard's death won't change NHL*, that the repeat deaths of NHL enforcers represented a "limited data base"; the need not to "jump to conclusions"; the "gap in the science"; and the science being "in its infancy."  The article then states that when Mr. Bettman was asked at the end of a Board of Governors meeting whether fighting in hockey is dangerous, he replied, "Maybe it is, maybe it's not."  When faced with the question of whether head trauma goes hand in hand with hockey fights, Bettman responded, "Sometimes it is, sometimes it's not."  When asked about the fact that the brains of deceased NHL players Boogaard, Rick Martin, Bob Probert and Reggie Fleming all showed signs of CTE, Bettman replied, "[w]e don't know everything that went on in their lives . . . . We don't know what else they had in common, if anything."  This cavalier dismissal was, and unfortunately continues to be, the NHL's default attitude towards its player safety.

for NHL players. The emotional and physical toll exacted on the NHL players that fought throughout their careers, like STEVEN R. MONTADOR, has led to terrible tragedies.

57.     The NHL has long known that "hockey fans stand up for two occurrences – goals and fisticuffs." But, the NHL refused to eliminate fisticuffs because "elimination of fisticuffs may be a disaster for the NHL and once removed will be impossible to reinstate without a media backlash." [12]

58.     The NHL, for decades, has refused to eliminate fighting from its games, practices or culture because of a fear of diminishing revenue.

59.     It is hypocritical and, in fact, negligent, for the NHL to express concern for player safety on the one hand, and allow fighting on the other.

60.     The NHL knows, or should know, that fighting causes brain trauma. As has been stated by Dr. Robert Cantu, a renowned neuro-scientist, "The brain doesn't know what causes it to be shaken – whether it's a helmet-to-helmet hit, a left hook or a check."

61.     The NHL further knew, or should have known, that brain traumas sustained in fights can lead to permanent brain injury, including, but not limited to, memory loss, dementia, depression, CTE, and related symptoms, including addiction.

62.     Yet, while personal tragedies such as that endured by the Montador family mount, the NHL still refuses to eliminate fighting.

63.     Eliminating fighting is a rules issue that can be easily implemented by the NHL without any collective bargaining.

_____

[12] In 1992, President/Legal Counsel, Gil Stein, received a comprehensive report on fighting from the President, General Manager and Head Coach of the Vancouver Canucks, J.B. Patrick Quinn. Document labeled NHL0016000 and NHL0016001 (De-designated); Produced *In Re: National Hockey League Players' Concussion Injury Litigation*, MDL No. 14-2551.

14

64.     Instead, for nearly a century, the NHL has developed and promoted a culture of gratuitous violence within NHL hockey.

65.     Part of the NHL's strategy has been to promote brutality and violence by glorifying the violent aspects of the game, including, but not limited to, the vicious bare-knuckle fist-fights that occur on the ice.

66.     Throughout its history, the NHL's wisdom in permitting and promoting violence in its game has been questioned. For example, in 1974, the Ontario Cabinet appointed Canadian lawyer William McMurtry to issue a report on violence in hockey.  As part of his research, McMurtry interviewed numerous NHL players. His official report concluded:

> In talking to numerous players in the NHL...they all feel that most advertising and selling of the game is over-emphasizing the fighting and brawling at the expense of educating the crowds about the skill and finesse. This past season the advertising for the NBC Game of the Week showed a film clip of a hockey fight. Can you conceive of any other sport promoting itself in this fashion?

67.     In 1975, the players proposed the imposition of an automatic suspension for the balance of the game in which a fight occurred (and at least one more game).  The NHL chose not to enact a rule change at that time. In rejecting the proposal, one team president's statement reflected the League's stance: "We believe in fighting.  It's an exciting part of the sport."

68.     One of the NHL players advocating for a ban on fighting, Bobby Hull, staged a one-game strike in protest of the NHL's commoditization of violence, stating "[t]he game is no pleasure any more. It's an ordeal."  Hull further stated

> It's time we took some action...because, if something isn't done soon, it will ruin the game for all of us. I've never seen so much stuff like this. I never thought it could be so bad...It's becoming a disaster...The idiot owners, the incompetent coaches, the inept

15

> players are dragging the game into the mud. They're destroying it
> with their senseless violence.

69. The NHL did not adhere to Hull's request. Instead, fighting increased over the following decade. The NHL has referred to the 1980s as The Golden Era of Fighting – during these dates, the League averaged approximately one fight for every game played.

70. On February 17, 1986, Sports Illustrated published an article entitled, <u>Hockey? Call It Sockey: Hockey's designated hit men are making a travesty of the game. It's high time to get rid of all the goons</u>, where it firmly criticized the NHL's failure to take action against violence, stating:

> [M]any NHL executives are scared to death that if fighting were
> banned from hockey, thousands of season-ticket holders who get
> their jollies from watching grown men in short pants in a quasi-
> legal, bare-knuckle battle would bail out on the spot. Violence
> sells. That's not news, so does sex. If that's what's important, why
> doesn't the league hire a bunch of bikini clad bimbos to skate
> around behind the Zambonis holding up placards showing each
> team's penalty totals?

71. By 1992, many involved in the NHL began realizing that permitting fighting in its games was foolish and that it must do more to keep its players safe (i.e., "The NHL has made incremental changes vis-à-vis fisticuffs in the past and based on their success should continue to do so."[13]) Yet, a discussion at the 1992 Board of Governors' Meeting regarding introducing a game misconduct penalty for a player who fights was never brought to a vote, despite at least seven clubs expressing strong desire for such a rule.

72. Despite repeated criticisms from players and media, as well as its own realization that it must continue to move towards eliminating fighting from its game, the NHL refused to ban

---

[13] Document labeled NHL0015999-6001 (De-designated); Produced *In Re: National Hockey League Players' Concussion Injury Litigation*, MDL No. 14-2551.

fighting and, in the 1990s and 2000s, its prevalence continued.  During these times the 'staged fight' was a nearly every night, every game phenomenon:

> The golden age of the hockey enforcer was born, stretching through [Marty] McSorley and Bob Probert, Tie Domi, Georges Laraque, Rob Ray and Donal Brashear. They increasingly settled their teammates' scores by fighting each other. Imagine in American football, if a linebacker hit a quarterback with what the quarterback's team believed was too much force. Or if a baseball pitcher plunked a star batter with a ball, or a basketball player committed a hard foul on a top scorer. The equivalent to hockey's brand of justice would find those teams sending a specific player from their bench– someone hardly valued for his skill as a player, perhaps rarely used– and having them fight one another.

> Their bouts combined the brutality of boxing and the showmanship of professional wrestling. The men sometimes fought for no purpose other than to satisfy the expectation of fans or the chance to be relevant. Coaches used them to stem the opposing team's momentum or change the tenor of the game-maybe "send a message" for the next time teams played. If felt like a sideshow. But the punches were real.

> When enforcers fought, the game clock stopped. Other players, restricted by stricter rules barring entry into a fight, backed away and watched. Fans, invariably, stood and cheered, often more vociferously than when a goal was scored.

> Television cameras zoomed in, and a graphic providing each fighter's height and weight often appeared on the screen. Play-by-play men took on the role of boxing announcers, their hyper-charged voices rising and falling with every blow. Punches produced a reflexive chorus of ooooohs from the crowd. The volume ratcheted with the sight of blood, flying equipment, maybe a dislodged tooth. The fight ended only when one of the players fell to the ice or when the violence slowed, like the dwindling energy of popcorn when nearly every kernel has popped...

> Fans gave standing ovations. Teammates banged their sticks on the boards in appreciation. Replays of the fight, usually in slow motion, filled the giant video screens in the arenas and the

television screens at home. Fights were staples of the nightly sports highlight packages.[14]

73.     The NHL obviously knew that it was extremely dangerous when two players 'square off' to fight, but instead of eliminating fighting, the NHL enhanced its visibility and promoted the fights in an effort to get more fans through the turnstiles.

74.     Armed with knowledge that fighting was physically dangerous and emotionally perilous, the NHL still promoted its fights, by:

(a)     Promoting the HBO documentary, Broad Street Bullies, on its Philadelphia Flyers affiliated website. The trailer for the film, viewable on www.flyers.nhl.com, features clip after clip of fighting and violent head shots, accompanied by voice-over testimonials extolling the virtues of winning through "intimidation" over talent.

(b)     Creating, through NHL Original Products– an agent and instrumentality of the NHL devoted to producing promotional films for the NHL–numerous features that focus on the hardest hits that take place on the ice, further advancing the NHL's culture of violence as entertainment.

(c)     Displaying on www.nhl.com its Enforcer/Fighters and fisticuffs in the main news story rotation on a nightly basis.

(d)      Producing on the NHL Network, a weekly program segment called "Top 10 Hits of the Week."

(e)     Permitting individual teams to show in-game replays of violent hits, with the marquee "Hit of the Game" above the jumbo television screens.

(f)     Creating through NHL Films, an agent and instrumentality of the NHL devoted to producing promotional films, numerous highlight features that focus solely on the hardest hits that take place on the ice. These featured videos are marketed and sold to advance the NHL's culture of violence as entertainment.

(g)     Licensing NHL-sponsored video games including fighting and vicious body checking. For example, the NHL licensed EA Sports to produce NHL 14, released on September 10, 2013, and which featured a completely revamped fighting system called the "Enforcer Engine." Those

---

[14] Branch, John. *Boy On Ice: The Life and Death of Derek Boogaard*. New York: W.W. Norton & Company, 2014. 61-63. Print.

new features included: (a) Enforcers/Fighters coming to the aid of downed superstars and initiated fights; (b) "physics-based punch targeting" that make blows more realistic; and (c) real-time facial damage such that bruising and black eyes remain throughout the game.

75.     The NHL's continued failure to eliminate fights from its game was negligent and demonstrated a conscious disregard for the safety and welfare of its players, including STEVEN R. MONTADOR.  The NHL has long known that its players involved in fights were susceptible to brain damage and/or depression and/or substance abuse, due to the extreme physical and emotional toll fighting placed upon them, but failed to put an end to the problem.

76.     For almost a century, while unnecessary violence, including brutal fist-fighting, has permeated NHL games, the NHL has been on notice that multiple blows to the head can lead to long-term brain injury, including but not limited to memory loss, dementia, depression, addiction and CTE and its related symptoms.  Yet, the NHL said nothing to its players about any of it.

77.     In 2007, during STEVEN R. MONTADOR's sixth year in the League, the NHL was queried on the juxtaposition of 'knocked out' boxers sitting out from further fights for 60-90 days, while NHL Enforcers/Fighters, even when knocked out, can come "back for more" almost immediately.  The NHL thought this was a good question[15], but did nothing to act on the provocative reality.

78.     Violence in hockey persists for one simple reason: Today, as in 1975, the men who control the game have no interest in eliminating it. Any reasonable analysis would conclude

---

[15] Document labeled NHL0029626 (De-designated); Produced *In Re: National Hockey League Players' Concussion Injury Litigation*, MDL No. 14-2551.

that players should not be policed by other players, that the threat of retaliation should not be used to enforce good behavior, that infractions of the rules should not be used to market a sport.

79. But, for nearly a century, the NHL has failed to eliminate fighting because it has continued to profit handsomely from its culture of violence, notwithstanding the brain injuries inflicted on NHL players like STEVEN R. MONTADOR. The NHL created, and refused to change, a culture in which the "toughest" players are glorified—and maintain job security—for their ability to dish out and endure severe violence on the ice.

80. By promoting and glorifying fighting, the NHL continues to perpetuate its message to players, coaches, and fans that blows to the head should not be considered serious injuries.

81. The NHL knew that by eliminating fights from their game they would decrease drug addiction and depression in the men it enlisted in the barbaric role.

82. The NHL, in breach of its self-imposed and self-declared duties to keep STEVEN R. MONTADOR safe, to advise him of all risks, and to not increase his risk of permanent brain damage and/or addiction, permitted and promoted his NHL fights.

83. In addition, the NHL breached its duty to disclose to STEVEN R. MONTADOR relevant and highly material health information it possessed regarding the significant risks associated with the head traumas endured during NHL fights, including, but not limited to, permanent brain damage.

84. As a result of the NHL's breaches of its duties, STEVEN R. MONTADOR suffered injury, including, but not limited to, CTE and its resulting symptoms.

20

85. As a proximate result of one or more of the foregoing negligent acts or omissions, STEVEN R. MONTADOR suffered personal and pecuniary injuries, including conscious pain and suffering and emotional distress prior to his death on February 15, 2015, and had he survived, he would have been entitled to bring an action for his injuries, and such action has survived him.

86. Plaintiff, PAUL MONTADOR, Executor and Estate Trustee of the Estate of STEVEN R. MONTADOR, Deceased, brings this Survival Action, pursuant to 755 ILCS 5/27-6, commonly known as the Survival Acts of the State of Illinois.

WHEREFORE, Plaintiff, PAUL MONTADOR, Executor and Estate Trustee of the Estate of STEVEN R. MONTADOR, Deceased, demands judgment against Defendants for a sum in excess of the minimum jurisdictional limit.

## COUNT III

## THE NHL's FAILURE TO WARN STEVEN R. MONTADOR OF THE LONG-TERM NEUROLOGICAL RISKS ASSOCIATED WITH REPETITIVE HEAD TRAUMA CAUSED CTE AND DEATH

Plaintiff re-alleges paragraphs 1 - 22 above and incorporate each allegation herein.

87. One of the areas of player safety that the NHL gratuitously committed to studying was the issue of repetitive head trauma sustained by NHL players.

88. Beginning in 1997, the NHL endeavored into the study of repetitive concussive and/or sub-concussive brain traumas amongst its player population.[16]

---

[16] The NHL consistently characterizes this 'concussion program' as a 'jointly administered' program with the NHLPA. This characterization is misleading– while certain aspects of the program may have enlisted a NLHPA representatives' involvement, the scope and focus of the program's activities were unilaterally dictated by the League. By way of example, the League determined which issues should be studied and which should be avoided.

89.     In furtherance of its study, the League collected and analyzed data on every player, including, but not limited to, birth date, educational background, playing history, contract history, injury[17] and retirement data. Additionally, it supposedly tracked all NHL concussions and stored video clips[18] of all NHL players who experienced concussions.

90.     The NHL, utilizing the data, supposedly studied the frequency, timing, duration of symptoms and mechanism of injury patterns for concussive brain traumas sustained by NHL players from 1997 through 2004.

91.     The NHL's study was highly anticipated by many, including NHL players.

92.     NHL players reasonably believed that the NHL's compiling of player medical reports of brain traumas, memorializing video imagery of those NHL players sustaining concussive brain trauma, and maintaining their neuropsychological testing results would provide the NHL with sufficient data to thoroughly study the issues and provide them with the most up-to-date information on the immediate and long-term risks of repetitive brain trauma in the NHL.

93.     NHL players hoped that the NHL's study would address the critical question: "Does repetitive head trauma in NHL hockey lead to long-term neurocognitive or neurodegenerative changes in NHL players' brains?"

94.     During, and after, this study period, the NHL had, and confirmed, a duty to analyze all issues related to repetitive brain trauma in the NHL and inform its players of the findings – including, but not limited to, the long-term risk exposure its players faced.

---

[17] Originally using the NHL Injury Surveillance System (NHLISS), the NHL collects, processes, stores and analyzes injury and exposure data for the NHL teams.

[18] A study on the mechanisms of brain injury was performed by way of a video analysis of every concussion suffered by an NHL player.

95.     By gratuitously conducting scientific research and engaging in discussion of the long-term effects of brain injuries sustained by NHL players, and by publicly maintaining that its Concussion Program was thoroughly analyzing concussion data, the NHL gave its players the false impression that it was working on their behalf to keep them informed and up-to-date on all medical and scientific advancements related to repetitive head trauma.

96.     In reality, the NHL simply sat on the data it collected. In fact, the NHL waited to publish its data for fourteen years (i.e. 2011).[19]

97.     Avoiding any clear findings, the Concussion Program report, after fourteen years and despite an abundance of developing scientific and medical literature about head hits and concussions, found only "potential adverse effects" from "continuing to play while symptomatic, failing to report symptoms to medical staff and failure to recognize or evaluate any suspected concussion." The "potential adverse effects" were not explained in any way.

98.     Soft-pedaling the problem still further, the report said only that its "findings also suggest that more conservative or precautionary measures should be taken in the immediate post-concussion period, particularly when an athlete reports or experiences a post-concussion headache, low energy or fatigue, amnesia, recurrent concussion or many different post-concussion symptoms, or when the athlete has an abnormal neurologic examination." In short, the report constituted another NHL assurance that brain damage was not a significant concern for NHL players.

---

[19] That report, was, at best, watered down - discussing only the number of concussions in the NHL for the regular seasons from 1997-2004. Listing nine specific study limitations, the report, fourteen years in the making, boiled down to a "more study is needed" dodge. The NHL's delay in publishing the Concussion Program report provided NHL players with a false sense of security that they were not at risk of permanent damage to their brains.

99.     The report did not conclude that players were at increased risk of developing a neurodegenerative disease or condition as a result of head hits while playing.  Nor did the report put NHL players on notice that the forgetfulness, mood swings, difficulties concentrating, and other signs of what retired players chalked up to "aging," were in fact the result of the repetitive head trauma they suffered while playing.

100.    All the report concluded, essentially, was that more education was needed about potential adverse effects.

101.    In January 2010, neuropathologists from the Boston University School of Medicine Center for the Study of Traumatic Encephalopathy ("BUSM") and the Veterans Affairs Boston Healthcare System, in collaboration with the Sports Legacy Institute, confirmed for the first time that a former hockey player, New York Ranger Reggie Fleming, had been diagnosed with CTE.

102.    In March 2011, Boston University's Center for the Study of Traumatic Encephalopathy announced that the brain of Bob Probert, age 45 at the time of his death, contained CTE as a result of contact to his head during his NHL career.  The NHL classified the findings as "interesting," but refused to "react or make changes based on findings related to one player."

103.    In the summer of 2011, three NHL Enforcers died, suddenly: Derek Boogaard, age 28; Rick Rypien, age 27; and Wade Belak, age 35.  After Boston University's Center for the Study of Traumatic Encephalopathy announced that it discovered CTE in Derek Boogaard's brain, the NHL publicly stated that "there isn't a lot of data, and the experts who we talked to . . . think that it's way premature to be drawing any conclusions at this point."

104.    Even to this day,[20] after repeatedly informing its players and the public that it is the "leader" in concussion care, knowledge, and research, the NHL boldly informs all NHL players, past, present and future, that there is no proven scientific or statistical evidence demonstrating a connection or correlation between repeated impacts to the head sustained in the NHL and long-term neurodegenerative diseases.

105.    The NHL's unwillingness to acknowledge the dangers of repetitive head trauma may be based on its historical refusal to study the long-term effects of repetitive head trauma on its players.  For example, in November 2009, the NHL contemplated studying the long-term neurocognitive and psychological effects of repeated concussions among retired NHL players. But, the NHL decided it was uninterested in conducting such a study and would rather *"leave the dementia issues up to the NFL!"*  The Defendants wanted to avoid and ignore the inconvenient truth that such a study would confirm.

106.    As a result of its repeated decisions to bury its collective head in the sand, the NHL never conducted any proposed study on its retirees, apparently not wanting to confirm what it already suspected - that repetitive head trauma sustained in contact sports can, and does, lead to permanent brain damage.

107.    Not informing STEVEN R. MONTADOR that he risked serious and permanent and disabling brain injuries or cognitive problems if he suffered concussion or continued to play after suffering a head hit, the League knew, or should have known, that STEVEN R. MONTADOR would understand the NHL's silence as affirmation that he not only could, but should, play in a violent manner and continue to play after a head injury, and that doing so posed

---

[20] After STEVEN R. MONTADOR's death and subsequent discovery of CTE, challenging the link between concussions and CTE, Gary Bettman said, "from a medical and science standpoint, there is no evidence that one necessarily leads to the other."

no danger to his long term brain health. The League induced him into continuing to play, and fight, in NHL games and practices.

108. At the time of each of Montador's concussion injuries, the NHL knew, or should have known, about scientific evidence demonstrating a correlation between repetitive head trauma and chronic neurocognitive and neurodegenerative illness and disabilities. It had a duty to relay this information to its players.

109. Defendants were under, but breached, a continuing duty to disclose the true character, quality, and nature of the after-effects of concussive events, sub-concussive events, and/or brain injuries.

110. As part of this duty, the NHL was required to keep NHL players informed of long-term neurological risks associated with head injuries suffered while playing hockey in the NHL, and not to omit material information about the risks of negative long-term effects or permanent neurological damage that can occur from head injuries incurred while playing hockey and/or fighting in hockey games.[21]

111. In breach of its duty, the NHL never told STEVEN R. MONTADOR about the long-term dangers of repeated brain trauma.

112. In breach of its duty, the League never told STEVEN R. MONTADOR or any NHL player that repetitive head trauma (like that sustained in bare-knuckle brawls) can, and does, cause brain damage, addiction and/or depression.

---

[21] The NHL states that education has been a vital component of its mission since 1997, and that its "[e]ducational efforts are directed towards all relevant parties in our game, including most importantly our Players, but also relevant Club personnel, including Club medical staff, Club owners and executives, team General Managers and Coaches, and on-ice game Officials."

113.    In further breach of its duty, the NHL demonstrated an utter indifference and conscious disregard of NHL Players' long-term health by:

(a)    creating, fostering, and promoting a culture of extreme violence, including head hits and violence from fighting, where head trauma to STEVE MONTADOR was a natural and common corollary;

(b)    failing to inform STEVEN R. MONTADOR, or any NHL Players, about the century-old scientific research on the negative health effects of head trauma and about anecdotal evidence from the negative health effects of head trauma from its own NHL players;

(c)    failing to warn STEVEN R. MONTADOR, or any NHL players, of the potential negative effects of head injuries suffered while playing in the NHL, including but not limited to: that they are at an increased risk for developing one or more serious, neurodegenerative diseases or conditions including, but not limited to, CTE, dementia, ALS, Alzheimer's disease, and Parkinson's disease, and the debilitating symptoms from each of them;

(d)    failing to adequately address the continuing health risks associated with concussive events, subconcussive events and brain injuries that the NHL players sustained;

(e)    failing to make any statements of substance about concussions, MTBI or other head injuries;

(f)    turning a blind eye to the risks to players of repetitive subconcussive and concussive head impacts;

(g)    avoiding any proper study of concussions and other head injuries; and/or

(h)    failing to ensure that concussed players are adequately warned of the permanent dangers that could befall them if they continued to sustain further head injuries.

114.    As a result of the NHL's breaches of its duties, STEVEN R. MONTADOR, suffered injury, including, but not limited to, neurodegenerative disease, including CTE and its resulting symptoms, which caused, or contributed to cause, his death.

115.    Plaintiff's decedent, STEVEN R. MONTADOR, left his son, Morrison Montador Robidoux, surviving him as his heir and next of kin.

27

116.     Plaintiff, PAUL MONTADOR, has been appointed Executor and Estate Trustee of the Estate of STEVEN R. MONTADOR, Deceased, and in such capacity brings this cause of action on behalf of the Estate of STEVEN R. MONTADOR for pecuniary damages pursuant to the Illinois Wrongful Death Statute, 740 ILCS 180/1, *et seq*.

WHEREFORE, Plaintiff, PAUL MONTADOR, Executor and Estate Trustee of the Estate of STEVEN R. MONTADOR, Deceased, demands judgment against Defendants for a sum in excess of the minimum jurisdictional limit.

## COUNT IV

## THE NHL'S INSISTENCE UPON PRESERVING and PROMOTING VIOLENCE IN SPITE OF THE OBVIOUS DANGERS CAUSED, or CONTRIBUTED TO CAUSE, CTE AND DEATH

Plaintiffs re-allege paragraphs 1 - 22 above and incorporate each allegation herein.

117.     The NHL's avaricious desire to permit and promote fighting in the NHL games is reprehensible in light of its knowledge of the dangers of head trauma.

118.     Fighting is an easily identifiable and readily eliminated cause of concussive and sub-concussive brain traumas.  Eliminating fighting necessarily reduces the incidence of trauma to the brain.  Reducing the incidence of trauma to the brain necessarily reduces the risk of long term neurodegenerative diseases and conditions. But, fully aware of this common sense logic, and well aware that fighting results in brain injuries that lead to the tragedy of long term neurodegenerative diseases and their consequences, the NHL has steadfastly refused to eliminate fighting from its product due to concerns over the bottom-line.

119.     The NHL's acceptance of fighting and, concomitantly, of the injuries and long term risks that fighting entails, demonstrates the fundamental fact that the NHL has always been,

28

and remains, willing to sacrifice players' brains in the name of tradition and in the cause of profit.[22]

120.    Fighting causes a very dangerous combination of physical and emotional turmoil for NHL players.  The emotional and physical toll exacted on the NHL players that fought throughout their careers, like STEVEN R. MONTADOR, has led to terrible tragedies.

121.    The NHL has long known that "hockey fans stand up for two occurrences – goals and fisticuffs."  But, the NHL refused to eliminate fisticuffs because "elimination of fisticuffs may be a disaster for the NHL and once removed will be impossible to reinstate without a media backlash."[23]

122.    The NHL, for decades, has refused to eliminate fighting from its games, practices or culture because of a fear of diminishing revenue.

123.    It is hypocritical and, in fact, negligent, for the NHL to express concern for player safety on the one hand, and allow fighting on the other.

124.    The NHL knows, or should know, that fighting causes brain trauma.  As has been stated by Dr. Robert Cantu, a renowned neuro-scientist, "The brain doesn't know what causes it to be shaken – whether it's a helmet-to-helmet hit, a left hook or a check."

---

[22] In December of 2011, Commissioner Bettman infamously stated, in an article titled, Cox: Boogaard's death won't change NHL, that the repeat deaths of NHL enforcers represented a "limited data base"; the need not to "jump to conclusions"; the "gap in the science"; and the science being "in its infancy."  The article then states that when Mr. Bettman was asked at the end of a Board of Governors meeting whether fighting in hockey is dangerous, he replied, "Maybe it is, maybe it's not."  When faced with the question of whether head trauma goes hand in hand with hockey fights, Bettman responded, "Sometimes it is, sometimes it's not."  When asked about the fact that the brains of deceased NHL players Boogaard, Rick Martin, Bob Probert and Reggie Fleming all showed signs of CTE, Bettman replied, "[w]e don't know everything that went on in their lives . . . . We don't know what else they had in common, if anything."  This cavalier dismissal was, and unfortunately continues to be, the NHL's default attitude towards its player safety.

[23] In 1992, President/Legal Counsel, Gil Stein, received a comprehensive report on fighting from the President, General Manager and Head Coach of the Vancouver Canucks, J.B. Patrick Quinn. Document labeled NHL0016000 and NHL0016001 (De-designated); Produced *In Re: National Hockey League Players' Concussion Injury Litigation*, MDL No. 14-2551.

125. The NHL further knew, or should have known, that brain traumas sustained in fights can lead to permanent brain injury, including, but not limited to, memory loss, dementia, depression, CTE, and related symptoms, including addiction.

126. Yet, while personal tragedies such as that endured by the Montador family mount, the NHL still refuses to eliminate fighting.

127. Eliminating fighting is a rules issue that can be easily implemented by the NHL without any collective bargaining.

128. Instead, for nearly a century, the NHL has developed and promoted a culture of gratuitous violence within NHL hockey.

129. Part of the NHL's strategy has been to promote brutality and violence by glorifying the violent aspects of the game, including, but not limited to, the vicious bare-knuckle fist-fights that occur on the ice.

130. Throughout its history, the NHL's wisdom in permitting and promoting violence in its game has been questioned. For example, in 1974, the Ontario Cabinet appointed Canadian lawyer William McMurtry to issue a report on violence in hockey. As part of his research, McMurtry interviewed numerous NHL players. His official report concluded:

> In talking to numerous players in the NHL...they all feel that most advertising and selling of the game is over-emphasizing the fighting and brawling at the expense of educating the crowds about the skill and finesse. This past season the advertising for the NBC Game of the Week showed a film clip of a hockey fight. Can you conceive of any other sport promoting itself in this fashion?

131. In 1975, the players proposed the imposition of an automatic suspension for the balance of the game in which a fight occurred (and at least one more game). The NHL chose not to enact a rule change at that time. In rejecting the proposal, one team president's statement

reflected the League's stance: "We believe in fighting.  It's an exciting part of the sport."

132.    One of the NHL players advocating for a ban on fighting, Bobby Hull, staged a one-game strike in protest of the NHL's commoditization of violence, stating "[t]he game is no pleasure any more. It's an ordeal."  Hull further stated:

> It's time we took some action...because, if something isn't done soon, it will ruin the game for all of us. I've never seen so much stuff like this. I never thought it could be so bad...It's becoming a disaster...The idiot owners, the incompetent coaches, the inept players are dragging the game into the mud. They're destroying it with their senseless violence.

133.    The NHL did not adhere to Hull's request.  Instead, fighting increased over the following decade.  The NHL has referred to the 1980s as The Golden Era of Fighting – during these dates, the League averaged approximately one fight for every game played.

134.    On February 17, 1986, Sports Illustrated published an article entitled, <u>Hockey? Call It Sockey: Hockey's designated hit men are making a travesty of the game.  It's high time to get rid of all the goons</u>, where it firmly criticized the NHL's failure to take action against violence, stating:

> [M]any NHL executives are scared to death that if fighting were banned from hockey, thousands of season-ticket holders who get their jollies from watching grown men in short pants in a quasi-legal, bare-knuckle battle would bail out on the spot. Violence sells. That's not news, so does sex. If that's what's important, why doesn't the league hire a bunch of bikini clad bimbos to skate around behind the Zambonis holding up placards showing each team's penalty totals?

135.    By 1992, many involved in the NHL began realizing that permitting fighting in its games was foolish and that it must do more to keep its players safe (i.e., "The NHL has made incremental changes vis-à-vis fisticuffs in the past and based on their success should continue to

31

do so."[24] ) Yet, a discussion at the 1992 Board of Governors' Meeting regarding introducing a game misconduct penalty for a player who fights was never brought to a vote, despite at least seven clubs expressing strong desire for such a rule.

136.    Despite repeated criticisms from players and media, as well as its own realization that it must continue to move towards eliminating fighting from its game, the NHL refused to ban fighting and, in the 1990s and 2000s, its prevalence continued.  During these times the 'staged fight' was a nearly every night, every game phenomenon:

> The golden age of the hockey enforcer was born, stretching through [Marty] McSorley and Bob Probert, Tie Domi, Georges Laraque, Rob Ray and Donal Brashear. They increasingly settled their teammates' scores by fighting each other. Imagine in American football, if a linebacker hit a quarterback with what the quarterback's team believed was too much force. Or if a baseball pitcher plunked a star batter with a ball, or a basketball player committed a hard foul on a top scorer. The equivalent to hockey's brand of justice would find those teams sending a specific player from their bench– someone hardly valued for his skill as a player, perhaps rarely used– and having them fight one another.
>
> Their bouts combined the brutality of boxing and the showmanship of professional wrestling. The men sometimes fought for no purpose other than to satisfy the expectation of fans or the chance to be relevant. Coaches used them to stem the opposing team's momentum or change the tenor of the game-maybe "send a message" for the next time teams played. If felt like a sideshow. But the punches were real.
>
> When enforcers fought, the game clock stopped. Other players, restricted by stricter rules barring entry into a fight, backed away and watched. Fans, invariably, stood and cheered, often more vociferously than when a goal was scored.
>
> Television cameras zoomed in, and a graphic providing each fighter's height and weight often appeared on the screen. Play-by-play men took on the role of boxing announcers, their hyper-charged voices rising and falling with every blow. Punches produced a reflexive chorus of ooooohs from the crowd. The volume ratcheted with the sight of blood, flying equipment, maybe a dislodged tooth. The

---

[24] Document labeled NHL0015999-6001 (De-designated); Produced *In Re: National Hockey League Players' Concussion Injury Litigation*, MDL No. 14-2551

fight ended only when one of the players fell to the ice or when the violence slowed, like the dwindling energy of popcorn when nearly every kernel has popped...

Fans gave standing ovations. Teammates banged their sticks on the boards in appreciation. Replays of the fight, usually in slow motion, filled the giant video screens in the arenas and the television screens at home. Fights were staples of the nightly sports highlight packages.[25]

137.     The NHL obviously knew that it was extremely dangerous when two players 'square off' to fight, but instead of eliminating fighting, the NHL enhanced its visibility and promoted the fights in an effort to get more fans through the turnstiles.

138.     Armed with knowledge that fighting was physically dangerous and emotionally perilous, the NHL still promoted its fights, by:

(a)     Promoting the HBO documentary, Broad Street Bullies, on its Philadelphia Flyers affiliated website. The trailer for the film, viewable on www.flyers.nhl.com, features clip after clip of fighting and violent head shots, accompanied by voice-over testimonials extolling the virtues of winning through "intimidation" over talent.

(b)     Creating, through NHL Original Products– an agent and instrumentality of the NHL devoted to producing promotional films for the NHL–numerous features that focus on the hardest hits that take place on the ice, further advancing the NHL's culture of violence as entertainment.

(c)     Displaying on www.nhl.com its Enforcer/Fighters and fisticuffs in the main news story rotation on a nightly basis.

(d)     Producing on the NHL Network, a weekly program segment called "Top 10 Hits of the Week."

(e)     Permitting individual teams to show in-game replays of violent hits, with the marquee "Hit of the Game" above the jumbo television screens.

(f)     Creating through NHL Films, an agent and instrumentality of the NHL devoted to producing promotional films, numerous highlight features that focus solely on the hardest hits that take place on the ice. These featured

---

[25] Branch, John. *Boy On Ice: The Life and Death of Derek Boogaard*. New York: W.W. Norton & Company, 2014. 61-63. Print.

videos are marketed and sold to advance the NHL's culture of violence as entertainment.

(g)    Licensing NHL-sponsored video games including fighting and vicious body checking. For example, the NHL licensed EA Sports to produce NHL 14, released on September 10, 2013, and which featured a completely revamped fighting system called the "Enforcer Engine." Those new features included: (a) Enforcers/Fighters coming to the aid of downed superstars and initiated fights; (b) "physics-based punch targeting" that make blows more realistic; and (c) real-time facial damage such that bruising and black eyes remain throughout the game.

139.    The NHL's continued failure to eliminate fights from its game was negligent and demonstrated a conscious disregard for the safety and welfare of its players, including STEVEN R. MONTADOR. The NHL has long known that its players involved in fights were susceptible to brain damage and/or depression and/or substance abuse, due to the extreme physical and emotional toll fighting placed upon them, but failed to put an end to the problem.

140.    For almost a century, while unnecessary violence, including brutal fist-fighting, has permeated NHL games, the NHL has been on notice that multiple blows to the head can lead to long-term brain injury, including but not limited to memory loss, dementia, depression, addiction and CTE and its related symptoms. Yet, the NHL said nothing to its players about any of it.

141.    In 2007, during STEVEN R. MONTADOR's seventh year in the League, the NHL was queried on the juxtaposition of 'knocked out' boxers sitting out from further fights for 60-90 days, while NHL Enforcers/Fighters, even when knocked out, can come "back from more" almost immediately. The NHL thought this was a good question[26], but did nothing to act on the provocative reality.

---

[26] Document labeled NHL0029626 (De-designated); Produced *In Re: National Hockey League Players' Concussion Injury Litigation*, MDL No. 14-2551.

142.    Violence in hockey persists for one simple reason: Today, as in 1975, the men who control the game have no interest in eliminating it. Any reasonable analysis would conclude that players should not be policed by other players, that the threat of retaliation should not be used to enforce good behavior, that infractions of the rules should not be used to market a sport.

143.    But, for nearly a century, the NHL has failed to eliminate fighting because it has continued to profit handsomely from its culture of violence, notwithstanding the brain injuries inflicted on NHL players like STEVEN R. MONTADOR. The NHL created, and refused to change, a culture in which the "toughest" players are glorified—and maintain job security—for their ability to dish out and endure severe violence on the ice.

144.    By promoting and glorifying fighting, the NHL continues to perpetuate its message to players, coaches, and fans that blows to the head should not be considered serious injuries.

145.    The NHL knew that by eliminating staged fights from their game they would decrease drug addiction and depression in the men it enlisted in the barbaric role.

146.    The NHL, in breach of its self-imposed and self-declared duties to keep STEVEN R. MONTADOR safe, to advise him of all risks, and to not increase his risk of permanent brain damage and/or addiction, permitted and promoted his NHL fights.

147.    In addition, the NHL breached its duty to disclose to STEVEN R. MONTADOR relevant and highly material health information it possessed regarding the significant risks associated with the head traumas endured during NHL fights, including, but not limited to, permanent brain damage.

148.    As a result of the NHL's negligence and conscious disregard for STEVEN R. MONTADOR's safety, STEVEN R. MONTADOR developed progressive, degenerative brain damage and addiction issues, as the result of numerous concussions sustained during his NHL career and the psychological impact of fighting in the NHL.

149.    As a result of the NHL's breaches of its duties, STEVEN R. MONTADOR suffered injury, including, but not limited to, CTE, which caused, or contributed to cause, his death.

150.    Plaintiff's Decedent, STEVEN R. MONTADOR, left his son, Morrison Montador Robidoux, surviving him as his heir and next of kin.

151.    Plaintiff, PAUL MONTADOR, has been appointed Executor and Estate Trustee of the Estate of STEVEN R. MONTADOR, Deceased, and in such capacity brings this cause of action on behalf of the Estate of STEVEN R. MONTADOR for pecuniary damages pursuant to the Illinois Wrongful Death Statute, 740 ILCS 180/1, *et seq*.

WHEREFORE, Plaintiff, PAUL MONTADOR, Executor and Estate Trustee of the Estate of STEVEN R. MONTADOR, Deceased, demands judgment against Defendants for a sum in excess of the minimum jurisdictional limit.

Dated: December 8, 2015                                  Respectfully submitted,

                                                        By*:* _____*/s/ William T. Gibbs*_____

Thomas A. Demetrio
William T. Gibbs
Corboy & Demetrio, P.C.
33 North Dearborn Street, 21st Floor
Chicago, Illinois  60602
(312) 346-3191

Atty. No. 108

Richard R. Gordon
Gordon Law Offices, Ltd.
211 West Wacker Drive, 5th Floor
Chicago, Illinois 60606
(312) 332-5200
Atty. No. 6277551